WASHBURNE (HAWES v.). See Case No. 6,242.

WASHBURNE (LOVEJOY v.). See Case No. 8,550.

## Case No. 17,219.

WASHING MACH. CO. v. EARLE.

[3 Wall. Jr. 320;[1] 2 Fish. Pat. Cas. 203; 18 Leg. Int. 348.]

Circuit Court, E. D. Pennsylvania. Nov. Term, 1861.

DISINTEGRATION OF PATENT RIGHTS — GRANTS TO DIFFERENT PERSONS.

1. A patentee may hold a close monopoly of his right, and if he does so, the court will restrain by injunction any persons using it. Or he may grant out his entire right. But he cannot divide his right into parts, and grant to one man the right to use it in its connection with or application to one class of subjects, and to another man the right to use it in its connection with or application to another class, to such an extent as that purchasers from any of these persons may not use the fabric purchased exactly as they like, and if they please in violation of what he has supposed were rights not granted by him.

[Cited in Hill v. Whitcomb, Case No. 6,502; American Cotton-Tie Co. v. Simmons, Id. 293; American Cotton-Tie Supply Co. v. Bullard, Id. 294; Holiday v. Mattheson, 24 Fed. 186.]

2. Ex. Gr. Goodyear, the patentee of vulcanized India rubber, might have prevented any person from using his fabric for any purpose. But if he grants to A. the exclusive right to use it to make "wringers" only, and to B. the right to make "tubes" only, A. cannot restrain C., who has bought tubes from B., from converting them into "wringers," by any process whatever that he, C., pleases. Neither can Goodyear.

This was a bill for injunction; the case being as follows: Goodyear was the patentee of what is known as vulcanized India rubber; an invention of undoubted originality, and which had been applied by him to a vast number of useful purposes. Among these were the following: (1) Making "wringers" for the different kinds of washing machines, now extensively used in hotels, public laundries, &c.; the office of these "wringers" being to press water, starch or other liquid mixture out of clothes, after they had been washed. (2) Making hose, pipe and tube; now used extensively for carrying water to fires, gardens, streets, mills, &c.; though used for many other purposes, as to convey sound, &c. Not having great capital of his own, Mr. Goodyear, or persons who had bought his patent, had parcelled out the invention among many licensees; granting to one person the right to use it for one purpose and to another the right to use it for another. To the complainants in this case, the washing machine company, he had granted the exclusive use of it in its application "to or in combination with all wringing, washing and starching machines," while to a company, called the Boston Belting Company, he had granted the use of it for making "hose, pipe and tube," and "no further;" the hose, pipe and tube described in one part of this deed of license being described in another, as "conduit hose—pipe and tube." That part of the washing machines above referred to as "wringers," were in fact iron shafts covered with India rubber. "The rubber"—to use the language of one of the workmen, "is constructed in rolls of a certain length, with an opening through the whole length for the metallic shaft, but much smaller than the shaft, so that the rubber, when the iron shaft is forced through it, being thick, gripes and clings to it, and turns with it, instead of turning upon it; thus wringing the clothes as they are passed between the two rollers. The smallness of the aperture through the rubber, and the consequent force and closeness with which it clings to the iron, makes the shaft and the rubber, in effect, one entire solid roll." The Boston Belting Company, whose right to make and sell "hose, pipe and tube," was not disputed, did not attempt to make "wringers." They made hose, pipe and tube alone. But a firm named Colley & Co., who had a patent of their own for mak-

---

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

ing washing machines, bought this hose, pipe or tube, and out of it they made "wringers" for their washing machines, by cutting the hose into short pieces, running iron shafts through the pieces and fastening them to the iron with cement. The result was that the firm of Colley & Co. made wringers out of the thinner hose much like those which the washing machine company could out of the thick rubber expressly prepared for the purpose; good enough at any rate to undersell the washing machine company, who were bound to pay to Goodyear three cents a pound for the right of using vulcanized rubber in making wringers, while the belting company had the privilege of making hose for two. The washing machine company now filed this bill, Goodyear being co-complainant, against certain agents or vendees of Colley & Co., praying a preliminary injunction against the sale of any washing machines of which the wringers were made by the use of hose.

Mr. Jenks, for complainant, cited great numbers of dictionaries of the English language, from Johnson down to Webster. and dictionaries of science, both Latin, French and English, to prove that each of the words "hose," "pipe," and "tube," meant essentially the same thing, and but one thing; st. a long hollow body, generally and in common parlance, cylindrical, and in the nature of a conduit for fluid; though neither of these qualities was of the essence of pipes or tubes. They might, he admitted, be of any substance, clay, wood, glass or what not. but that they should be hollow, and not solid, was of the essence of hose. pipes and tubes alike; and this point he abundantly made out on the authorities which he cited, with great research and learning. This being so, he admitted that as long as the fabrics of the Boston Belting Company were used for any purpose for which hose, pipes or tubes could, in their proper nature, be used—that is to say, so long as they were left hollow and as conduits, whether for water, air, light, steam or any other substance or element capable of transmission through them—neither Goodyear, Colley & Co., nor the washing machine company, nor any one else could complain. But here was an abuse; they take tubes, and permanently filling them up with an iron axis larger than the hollow of the pipe, and so stretching them, make them solid bodies. The case states that in the wringers of all washing machines, "the shaft and the rubber form, in effect, one entire solid roll." Can a man purchase one kind of patented articles, cut them up—in fact destroy their identity and nature—and then use the fragments in a way never contemplated in regard to the whole thing while in a perfect state. and in a way which directly interferes with the reserved rights of the patentee, or with those to whom he has granted them? In the present case the expression is, "conduit hose, pipe and tube," which shows plainly that the words "hose, pipe and tube," were used in their strict

sense, as pipes or channels for the conveyance of fluid.

Mr. Gifford, for defendant.

The use of vulcanized rubber for making conduit, hose, pipe or tubing, was conveyed by the strongest terms; there is no restriction upon the use of them; and therefore the grant carries the right to use them for any purpose to which they are applicable. The grant conveys the right for conduit. The word conduit is a noun, and is defined by lexicographers to be "a conducting pipe or tube." The conveyance, therefore, does not stop with granting a right to conducting pipe, but after doing that, by the well-selected term "conduit," it goes on and conveys also the right to hose, pipe and tubing; showing that the intention was to convey the right to that form of rubber for all the uses to which it is applicable. The complainants, to avoid this result, are driven to the necessity of distorting the language by a violation of common rules of grammar, and calling the word "conduit" an adjective which in English is a noun, and was never anything else. But the complainants contend that the rollers in the wringing machines are not tubes; let us look at that.

1st. The complainants substitute in their treatment of the subject the aggregate thing, to wit: the roller in which the tube is used, and then ask whether such aggregate thing is a tube. A wagon is not a wheel, but a wheel was used in its construction, and such was a proper use of the wheel, and it is none the less a wheel because it forms a part of the wagon. So with a roller of the wringing machines. It cannot be called a tube in the aggregate, but nevertheless a tube was used in the construction of it, and does not cease to be a tube because it forms a part of the roller.

2d. A tube is cylindrical, and that is the form which is required in the wringing machines. It has this form before being used in that machine, and it retains that form when in and a part of it.

3d. A tube has a caliber, and a caliber is indispensable to put the iron rod through in its use in the wringing machine, as much as it would be to conduct water.

4th. It is therefore plain that the use of a tube or pipe to put the iron rod through to make a roller, is a direct and proper use of it, employing all the functions of a tube. and continuing to employ them, and without those functions no such use could be made of it.

5th. The roller is composed of the tube of rubber and the rod of iron, and neither, after their union, ceases to be what it was before. The rod of iron is still a rod of iron, and the rubber tube is still a rubber tube, and in the aggregate they are a rod of iron through a rubber tube. When the man makes the roller, by putting the rod of iron through the tube. he is simply using, and in a useful and proper way, a rubber tube. and no other form of rubber would answer his purpose. He is not

destroying the tube and using the material of it for some other purpose; on the contrary, he is using the tube by filling it with iron, which is as legitimate a use as if he were to fill it with water.

But the complainants say that in using the tube as a part of the roller, the tube is more or less stretched. If this be so, then it is simply a stretched tube. The tube is not destroyed. If filled with water it might be stretched; but who would contend that for that reason it had ceased to be a tube? Where a party has a license to make and sell an article of a certain form and function, if the purchaser, instead of using that form and function, destroys such form and function, and uses the material, to wit, the vulcanized rubber, to make a rubber article of a different form and function, and for which the form of the article purchased was not adapted, a very different question arises from any question in this case, and one which, it is submitted, is not necessary for the court to trouble itself with in deciding this case. To illustrate. If a man were to purchase India rubber boots of a party having a license only to use vulcanized rubber for boots, and after so purchasing them, instead of using the function of a boot, were to destroy that function by cutting them up in strips and using them for springs, or to make shirred goods out of, the question then would be, whether he would have a right to destroy the licensed form and function of the rubber instead of using that form and function, and to make some other form of a rubber article out of the material. But in this case there is no such question; the tubular form of the rubber is not destroyed, but it is used, and necessarily used, and continued in use; and such form and function is indispensable for the use to which it is applied.

GRIER, Circuit Justice. The right of the Boston Belting Company to manufacture pipes or tubes is not disputed. They pay a certain tariff per pound for the right to use the patented process: the material thus manufactured by them belongs to them, and not to Goodyear. Any covenant between them and him that they will not manufacture certain articles, may be valid as between the parties, but it does not run with the rubber, like a covenant on land. Colley & Co., when they purchased their tubes are absolute owners of them, and may convert them into rolls for wringers to their washing machines, or put them to any other use. They might have bought belting or overshoes, or any other article made by the licensees of Goodyear, and converted the material to any purpose that suited them. I may purchase a tobacco pipe made of this material, but I am not bound to smoke with it, and may convert it into an inkstand. The agreement between the licensees that A. shall make all the pipes, and B. all the inkstands, gives neither of them a right to the interference of a chancellor to compel me to smoke with my pipe, or to put

ink alone in my inkstand. They cannot oblige me to use, in subservience to their arrangements, that which has become my property.

But, say the complainants, although it is true that a "tube" is defined to be a hollow cylinder, yet it is generally used to convey water, and is called a water pipe. In addition, the Boston Belting Co. pay a tariff of but two cents; whereas, the complaining corporation pay three cents, and therefore ought to have a monopoly of making rollers. The perfect answer to this is, that the complainants have no patent or exclusive monopoly of making rollers of vulcanized rubber. Goodyear, by virtue of his patent, might have manufactured it all himself, and sold it for such price as he could get; but his patent gives him no power to control the use which persons who purchase may make of it. Vulcanized rubber may be applied to a thousand purposes, from a tube to a steam engine, but this patent gives no power to the patentee to parcel out his one monopoly into a thousand sub-monopolies. He may make any covenant he pleases with his licensees, and by that means may dispose of his special licenses to great profit, but he cannot compel the public to notice or regard such agreements, or the right conferred or reserved by them. If his licensees do not perform their agreements, his remedy is by action against them on his covenants, and not by recourse to a chancellor to restrain third persons who have purchased vulcanized rubber from his licensees from using it, when it is theirs, for any purpose they please.

The bill does not complain that the machines sold by defendants are made out of rubber purchased from one who has pirated the patented process, but that the manufacturer who made them did not buy them from the complaining corporations on whom Goodyear assumes to have the power of conferring a monopoly to apply his rubber to that purpose. But the patent conferred no such power on him or them. Every person who pays the patentee for a license to use his process becomes the owner of the product, and may sell it to whom he pleases, or apply it to any purpose, unless he bind himself by covenants to restrict his right of making and vending certain articles that may interfere with the special business of some other licensees. The contrivance of the patentee to destroy competition may be valid, but the covenant binds only the parties to it. If a stranger purchase the product from one licensed to use the process, he need look no further, and may use it for his own purposes, without inquiring for or regarding any private agreement of licensees not to compete with one another.

In conclusion, the right of the Boston Belting Company to use the process in their manufacture of belting, packing, hose, pipe and tubing, is admitted. Consequently that company may sell their manufactures to whom they please, without inquiring the purpose of

the purchaser, or imposing any condition on him as to how he shall use his own property.

As a corollary from these propositions, it follows that Colley & Co. may convert any of these articles, when purchased by them, into rollers for their wringing machines, without infringing the rights of the complainants, whose arrangements to create a monopoly cannot affect the right of Colley & Co. to do as they please with that which is their own. Injunction refused, with costs.

[For other cases involving this patent. see note to Goodyear v. Railroads, Case No. 5,563.]